# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

### No. ACM S32631 (f rev)

————————————

### UNITED STATES
*Appellee*

**v.**

### Tymon C. BLOW
Airman Basic (E-1), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 23 August 2022

————————————

*Military Judge:* Mark W. Milam; Andrew R. Norton (remand).

*Sentence:* Sentence adjudged on 21 August 2019 by SpCM convened at Royal Air Force Mildenhall, United Kingdom. Sentence entered by military judge on 2 October 2019 and re-entered on 3 June 2021: Bad-conduct discharge, confinement for 5 months, and a reprimand.

*For Appellant:* Lieutenant Colonel Lance J. Wood, USAF; Major Ryan S. Crnkovich, USAF; Major Benjamin H. DeYoung, USAF; Major David A. Schiavone, USAF; Mark C. Bruegger, Esquire.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Jessica L. Delaney, USAF; Major Abbigayle C. Hunter, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and ANNEXSTAD, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge KEY and Judge ANNEXSTAD joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

JOHNSON, Chief Judge:

Appellant's case is before this court for the second time. A special court-martial composed of a military judge alone found Appellant guilty, contrary to his pleas, of two specifications of failure to obey a lawful order and one specification of assault consummated by battery in violation of Articles 92 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 928, respectively.[1] The military judge sentenced Appellant to a bad-conduct discharge, confinement for five months, and a reprimand. The convening authority originally took "no action" on the sentence, but provided the language of the adjudged reprimand. The military judge signed an entry of judgment reflecting the adjudged findings and sentence.

In Appellant's initial appeal to this court he raised four assignments of error: (1) whether the evidence supporting Appellant's conviction for assault consummated by a battery is legally and factually sufficient; (2) whether the military judge abused his discretion when he permitted the introduction of certain rebuttal evidence; (3) "whether Appellant's sentence is inappropriately severe compared to the sentence of his co-actor;" and (4) whether the convening authority's failure to take action on the sentence required remedial action. This court determined that remand to the Chief Trial Judge, Air Force Trial Judiciary, was warranted with regard to issue (4), and we deferred resolution of the remaining issues. *United States v. Blow*, No. ACM S32631, 2021 CCA LEXIS 232, at *2, *7 (A.F. Ct. Crim. App. 14 May 2021) (unpub. op.).

On remand, the convening authority took action on the entire sentence and a military judge properly re-entered the judgment of the court-martial. The record has returned to this court for completion of our review pursuant to Article 66(d), UCMJ, 10 U.S.C. § 866(d). In addition to the issues previously deferred, Appellant now personally asserts two additional assignments of error pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (5) whether Appellant's election to be tried by the military judge alone was improvident in light of the unanimous jury verdict requirement announced in the United States Supreme Court's decision in *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020); and (6) whether the military judge abused his discretion by admitting closed circuit television (CCTV) video depicting the charged assault consummated by a battery. We have carefully considered Appellant's arguments with respect to issue (5) and find that issue does not require discussion or warrant relief. *See*

---

[1] References to Article 128, UCMJ, are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise specified, all other references to the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

*United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *see also United States v. Anderson*, No. ACM 39969, 2022 CCA LEXIS 181, at *57 (A.F. Ct. Crim. App. 25 Mar. 2022) (unpub. op.) (finding unanimous court-martial verdicts not required in light of *Ramos*), *rev. granted*, ___ M.J. ___, 2022 CAAF LEXIS 529 (C.A.A.F. 25 Jul. 2022). With regard to issue (1), we find certain language in the Specification of Charge I (assault consummated by battery) is not factually sufficient, and we except certain language therefrom and reassess the sentence. With regard to the remaining issues, we find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings, as modified, and the sentence, as reassessed.

## I. BACKGROUND

In November 2018, Appellant was a 21-year-old Airman stationed at Royal Air Force (RAF) Mildenhall, United Kingdom. On the night of 24–25 November 2018, Appellant and three other Airmen—Airman (Amn) NB, Amn MO, and Senior Airman (SrA) DG—traveled to a nightclub in Cambridge, United Kingdom.[2] Appellant was involved in an altercation outside the club between the Airmen and several British citizens, including RM, which resulted in Appellant's conviction for assault consummated by a battery against RM. The details of this incident were the subject of dispute at trial, and we address the evidence regarding this offense in detail below. Initially, British police investigated the incident, but British authorities eventually transferred the case to the United States Air Force for prosecution.

On 22 March 2019, Appellant received an order from his squadron commander "restrain[ing]" Appellant from initiating any contact or communication with Amn NB, and requiring Appellant to remain at least 500 feet away from Amn NB until 22 July 2019. On 26 March 2019, Appellant received an order from his squadron commander restricting him to the limits of RAF Mildenhall for 60 days, *i.e.* until 25 May 2019. However, on 12 May 2019, in violation of both orders, Appellant travelled in a car with Amn NB and two other Airmen from RAF Mildenhall to a nightclub in the town of Peterborough. Appellant's misconduct came to light after, on the drive back to RAF Mildenhall, the Airman driving the car lost control and crashed into a body of water. Following this incident, Appellant was held in pretrial confinement from 14 May 2019 until he was sentenced on 21 August 2019.

---

[2] Airman NB was the subject of a separate special court-martial previously reviewed by this court. *United States v. Bah*, No. ACM S32634, 2021 CCA LEXIS 348 (A.F. Ct. Crim. App. 9 Jul. 2021) (unpub. op.), *rev. denied*, 82 M.J. 118 (C.A.A.F. 2021).

## II. DISCUSSION

## A. Legal and Factual Sufficiency of Assault Consummated by Battery

### 1. Additional Background

Appellant challenges the legal and factual sufficiency of his conviction for striking RM "in the body and head with a belt and his hand." Accordingly, we address in some detail the relevant evidence adduced at trial.

#### a. The CCTV Video

The Government introduced video recorded by a CCTV security camera across the street from where the charged assault took place. The figures depicted in the video are blurry and indistinct. However, Appellant is visible in the video and, based on witness testimony and other photographic evidence, identifiable due in large part to the distinctive dark jacket with a fur-lined hood he was wearing. The video appears to depict the following sequence of events.

The victim, RM, and his three civilian companions are walking away from the club on a sidewalk between a street and the wall of a church. Appellant and three other Airmen—Amn NB, Amn MO, and SrA DG—follow and overtake RM from behind. In particular, Amn NB approaches RM from the right side and Appellant approaches from the left. Amn NB appears to initiate the assault by lunging at RM, and he appears to strike RM's head with his hand. RM recoils away from Amn NB and toward Appellant, who appears to lash at or whip RM with something in his right hand, once and perhaps twice. RM then moves away from Appellant, surrounded by several other figures, toward a parked van. Appellant follows the group toward the van; Appellant keeps his right arm out to the side as if he were holding something, although no item can be discerned at this point due to the poor quality of the video. RM and two other figures—RM's male friend D and Appellant's companion SrA DG—then fall to the ground in front of Appellant, Amn NB, and Amn MO; as they fall, Appellant again apparently lashes or whips at one of the falling figures with an item in his hand.

After the figures fall, Appellant twice lashes violently at a figure on the ground with the item in his hand, while Amn NB and Amn MO strike at figures on the ground with their hands and feet, and SrA DG regains his feet. One of RM's female companions then pushes Appellant to one side, but he returns to the fallen figures and lashes once again at someone on the ground. At this point, RM's friend D gets to his feet and scrambles away; as he does so, Appellant appears to strike D with his left hand and then lash at D once with the item in his right hand. Appellant is then again pushed away by one of RM's female companions. The Airmen withdraw a short distance, although still in the frame of the camera, as RM is helped to his feet and eventually moved next

to the wall of the church. Although the confrontation between the Airmen and RM's companions continues for approximately two more minutes, with some blows exchanged, no further assaults are perpetrated on RM. At one point, Appellant appears to be holding a belt-like item in his hand. Eventually the Airmen flee down the alley back toward the club as British police arrive, and the video ends.

### b. RM's Testimony

RM testified that on the night of 24–25 November 2018, he, his friend D, and two female acquaintances went to the club to celebrate a birthday. At one point, RM and one of the women were at the smoking area outside the club when SL, the other woman in his group, came outside. RM heard "American voices calling [SL] a ho, and derogatory sort of terms." RM responded by telling the Americans, whom he had not met before, "'You shouldn't be speaking to [SL] like that. You're not in Brooklyn or wherever,' to that sort of extent." The Americans' reaction to RM was verbally "quite hostile," but SL finished her cigarette and RM and the two women went back inside the club.

RM and his group later left the club. Over the course of the night, RM estimated he had drunk two bottles and one can of beer and two glasses of champagne. He testified that at the point he left the club he was not drunk and was "in control of his faculties."

RM testified that after he left the club, in his "peripheral view" he saw one of the individuals from the incident at the club, wearing a "white baseball cap and white zip-up jacket," with "something swished around his hand." RM then felt a "massive blow on top of [his] skull," after which the hood of his jacket was pulled over his head and he was struck repeatedly in the head from "both sides." RM then fell to the ground, where he was "kicked and punched unconscious." RM, who was 51 years old at the time of the assault, denied having any weapons with him and could not remember if he fought back against his assailants. RM testified that as a result of the assault he suffered a cut on top of his head, his ribs hurt, and he had experienced tinnitus "ever since."

### c. Bystander Testimony

The Government called PS, a British civilian who was walking nearby with his girlfriend and another female friend, LM, when the incident occurred. PS could not tell how the fight started, although it looked like one "older" individual "had been jumped on by a group from behind, and they sort of run him into a taxi that was by the road, and then taken him to the ground after that." PS's "main memory" of the incident was that he "saw a weapon." PS testified: "At the time it looked like a stick, or a rod, about 2 feet in length, and somebody was swinging overarm, downwards onto somebody who, I think, was already on the ground at that point." He continued: "Later, after things had broken up,

I saw the same person holding a belt in his hand." PS agreed that the person holding the belt "looked to be striking another individual." After the assault, LM assisted the victim, who was bleeding from his head and lost consciousness for a period of time.

PS's friend LM also testified regarding the incident. She observed "an older gentleman" in a fight with several other men, during which he was "punched," went "down on the ground," and "was kicked repeatedly to the head, and punched and kicked in the stomach." LM confirmed there were "definite connections." As the fight "abated," LM—who had medical training—assisted RM and moved him away from the continuing confrontation and to the side of the church. LM testified RM had a cut on his head and lost consciousness for approximately 30 seconds at one point.

Neither PS nor LM specifically identified Appellant as being involved in the incident, or attributed any specific actions to him.

### d. SrA DG's Testimony

The Government called SrA DG, an acquaintance of Appellant's and part of the group that travelled with Appellant from RAF Mildenhall to Cambridge on the night of 24–25 November 2018. SrA DG remembered an argument at the club between Appellant and a "British guy," who hit Appellant. SrA DG testified he did not remember what the argument was about or what was said, and that the club's security guards broke up the incident and escorted the Airmen out. Trial counsel played the CCTV video during SrA DG's testimony, and SrA DG identified Appellant, Amn NB, and himself in the video. SrA DG testified he ran away when the police arrived; however, he stopped when the police ordered him to. SrA DG was arrested, handcuffed, and briefly detained before being released without being charged.

### e. Police Testimony

The Government called three British police officers to testify. Collectively, their testimony established that Appellant and Amn NB were arrested by the British police in Cambridge near the scene of the assault on RM. Both were photographed wearing distinctive clothing that assisted in identifying them from the CCTV video. In addition, the police seized a belt from Appellant. The police did not note any injuries or blood on Appellant at the time of his arrest.

### f. Staff Sergeant ER's Testimony

The Defense introduced the testimony of Staff Sergeant (SSgt) ER, who was at the same club on the night in question but not as part of Appellant's group. SSgt ER testified he saw Appellant, Amn NB, Amn MO, and another Airman at the club. SSgt ER did not witness the incident between Appellant's group and RM. However, he saw the aftermath including "someone on the ground

who looked like he was in rough shape," and he saw Appellant, Amn NB, and Amn MO together shortly thereafter. SSgt ER further testified he had seen the CCTV video and was able to identify Amn MO, who had been wearing a white bandana on his head that night.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, ___ M.J. ___, No. 22-0111, 2022 CAAF LEXIS 278 (C.A.A.F. 12 Apr. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (internal quotation marks and citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, the "standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (internal quotation marks and citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

In order to convict Appellant of the charged offense of assault consummated by a battery in violation of Article 128, UCMJ, the Government was required to prove: (1) that Appellant did bodily harm to RM; and (2) that the bodily harm was done with unlawful force or violence. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 54.b.(2).

**3. Analysis**

The military judge found Appellant guilty as charged of the Specification of Charge I, which alleged Appellant "unlawfully str[uck] [RM] in the body and head with a belt and his hand." We find the Government introduced proof beyond a reasonable doubt that Appellant unlawfully struck RM with a belt; however, we are not convinced the Government proved Appellant specifically struck RM on the head, or with his hand in addition to the belt.

The most compelling evidence is the CCTV video, in combination with testimony and photographic evidence that enables us to identify Appellant and other individuals depicted in the video. The video shows Appellant's group initiating the assault by overtaking RM from both sides and Amn NB striking RM in the head. Immediately thereafter, Appellant swings specifically at RM with what later portions of the video, the testimony of PS, and police testimony prove to be a belt, as charged. Appellant strikes with the belt several more times as RM falls and is essentially helpless on the ground, before D arises and Appellant specifically aims two blows at D. Although the target of these several intervening blows is less distinct, the evidence as a whole indicates the Airmen specifically targeted RM for attack, and that RM was actually being struck by multiple individuals during the assault. We find the evidence convincingly demonstrates that Appellant struck RM somewhere on his body with a belt.

We are not so convinced Appellant separately struck RM with his hand. Appellant may have done so; and applying the "very low threshold" for *legally* sufficient evidence, we find there was evidence to support the military judge's finding in that respect. *King*, 78 M.J. at 221. However, we are not ourselves convinced beyond a reasonable doubt. In the video, Appellant's evident focus was on striking with the belt. We cannot clearly discern any point at which Appellant landed a blow on RM with his hand rather than the belt.

Similarly, we are not convinced beyond a reasonable doubt that Appellant specifically struck RM on the head. It is not possible to discern from the video where on RM's body the belt struck him. It is true that RM associated the initial "massive blow" to his head with being hit by an object, and we believe that a belt buckle might cause the type of cut that RM suffered on his head. However, RM's memory of the incident is poor in several respects, and his testimony suggesting that it was an individual wearing a white baseball cap and white jacket who struck him with an item wrapped around his hand poorly matches the other evidence. The only Airman involved in the assault whose clothing remotely fits that description was Amn MO, who was wearing a white bandana on his head but did not appear to have anything in his hand. In addition, the video strongly suggests Amn NB struck the first blow to RM's head. It is possible the cut to RM's head was caused by some unknown item in or on Amn NB's hand, or happened when RM fell against an object or to the ground, or

8

was caused by later kicks or strikes to his head. Notably, there is no evidence of blood on Appellant's hands, belt, or other clothing.

We note that this court's opinion reviewing the special court-martial of Amn NB relied on his liability as a principal for aiding and abetting Amn MO's assault and battery of RM to uphold the Article 128, UCMJ, conviction. *United States v. Bah*, No. ACM S32634, 2021 CCA LEXIS 348, *18–22 (A.F. Ct. Crim. App. 9 Jul. 2021) (unpub. op.), *rev. denied*, 82 M.J. 118 (C.A.A.F. 2021). However, we cannot uphold Appellant's conviction of the entire Specification of Charge I under a similar theory here. In *Bah*, the Government specifically asked the military judge in that case[3] to consider Amn NB's guilt as a principal pursuant to Article 77, UCMJ, 10 U.S.C. § 877 (2016 *MCM*), by aiding and abetting others to commit assault consummated by battery on RM. *Bah*, unpub. op. at *11. Moreover, at the defense's request, the military judge made written special findings, which included that Amn NB by his actions aided and abetted Appellant and Amn MO to assault RM, and conspired with Appellant and Amn MO to unlawfully strike RM. *Id.* at *12.

In contrast, the Government made no equivalent argument and the military judge made no equivalent special findings in Appellant's case. Indeed, during oral argument, trial counsel acknowledged the possibility the military judge would not be convinced of Appellant's guilt of the entire specification, in which case the Government proposed the military judge except the unproven language or convict him of a lesser included offense:

> If Your Honor doesn't think that each of those individual parts have been proven beyond a reasonable doubt; for some reason if you think the CCTV footage, all the other testimony is just not persuasive beyond a reasonable doubt, you have a variety of options that you could engage in, in this case.
>
> The first option would be you could strike through, except some words about striking in the head. You could get rid of that language. You could get rid of the fist. Or alternatively you could even go to some type of lesser included offense where there was just a simple assault, essentially an attempt to commit the assault consummated by a battery.
>
> So if for some reason you think there is some technicality, or the connection piece was - something that's slightly missing, then you can still have a variety of other options to find him guilty under Article 128, Your Honor.

---

[3] Appellant and Amn NB were convicted by different military judges.

The essential point is that an appellate court may not "affirm[ ] a conviction based on a different legal theory than was presented at trial." *United States v. English*, 79 M.J. 116, 122 (C.A.A.F. 2019) (citations omitted). So far as the record indicates, the military judge did not convict Appellant for liability as a principal under Article 77, UCMJ, for aiding or abetting others, and thus we may not affirm his conviction on such a theory.

Accordingly, drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction of the Specification of Charge I beyond a reasonable doubt. Having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt, excepting the words "and head" and "with his hand." We take corresponding action in our decretal paragraph.

Having modified the findings, we have considered the reassessment of Appellant's sentence in light of the factors enumerated in *United States v. Winckelmann*, 73 M.J. 11, 15–16 (C.A.A.F. 2013) (citations omitted). We find reassessment is appropriate. Based on the modified findings, we conclude the military judge would have imposed the same adjudged sentence of a bad-conduct discharge, confinement for five months, and a reprimand. Our modification does not substantially alter the essential nature or extent of Appellant's misconduct. In addition, the military judge could reasonably have considered Appellant's repeated misconduct, reflected not only in his convictions but in three nonjudicial punishment actions and two vacation of suspended punishment actions under Article 15, UCMJ, 10 U.S.C. § 815, among other adverse actions admitted as prosecution exhibits, reflected negatively on his rehabilitation potential. Significantly, the military judge adjudged a concurrent five-month sentence for one of the Article 92, UCMJ, offenses as well as for the Article 128, UCMJ, offense, so the overall term of confinement presumably would not have changed. We also conclude the military judge would still have imposed a bad-conduct discharge and reprimand. Furthermore, having reviewed the language of the reprimand supplied by the convening authority, we find no cause to modify the reprimand or set it aside.

## B. Rebuttal Evidence

### 1. Additional Background

During presentencing proceedings, the Government called Technical Sergeant (TSgt) IW, Appellant's former supervisor during a six-month period. When asked for his opinion regarding the character of Appellant's service during his supervision, TSgt IW testified Appellant was "an extremely poor troop." On cross-examination, TSgt IW testified Appellant arrived for work "a little

disheveled" numerous times, and "a couple of times" Appellant smelled like alcohol and appeared hung over. Following cross-examination, the military judge asked TSgt IW whether he "talk[ed] to somebody about a concern that [Appellant] might have a problem or anything like that." TSgt IW responded that it had been brought up to the first sergeant, and Appellant had been "allotted ADAPT[4] and everything like that." TSgt IW testified Appellant had been given time to attend ADAPT, but TSgt IW did not personally know if Appellant actually attended ADAPT appointments.

Appellant's mother, Ms. CB, testified by telephone during the Defense's presentencing case. During her direct testimony, Ms. CB opined, "I think this all has something to do with the alcohol use he always did before he was in [pretrial] confinement." When the military judge asked Ms. CB whether Appellant's offenses seemed "out of character" for him, she replied, "Absolutely. . . . [I]t's still hard for me to wrap my head around, because that's not at all the young man that we raised and that he is. . . . So to me it really is extremely - alcohol seems to - this is all to what he has done, to alter his personality, his [inaudible]. That is not [Appellant]."

Appellant's stepfather, Mr. CB, a retired noncommissioned officer and former first sergeant in the United States Army, also testified by telephone as a defense witness. During the direct examination, trial defense counsel asked Mr. CB what the "rules [were] going to be like concerning alcohol" when Appellant returned to live with his parents after leaving the Air Force. Mr. CB responded,

> There's going to be no alcohol. And he needs help. If [he] needs that help, professional help, to help him overcome that, that is not of any question. He will get that help. It will be provided to him, and which I think that is probably along the lines of what needs to happen. And so that help will be provided to him.

Following the direct examination, the military judge asked Mr. CB, "What makes you think he's going to follow your, [sic] and why would he care if he didn't care about rules from a Lieutenant Colonel that was his commander?" Mr. CB provided a lengthy response contrasting the family environment with the military environment, and describing his Army experience that troubled

---

[4] "ADAPT" is an abbreviation for the "Alcohol and Drug Abuse Prevention and Treatment" program. *See* Air Force Instruction 44-121, *Alcohol and Drug Abuse Prevention and Treatment Program* (18 Jul. 2018).

individuals would be removed to a different environment "where they can start over." In pertinent part, in the midst of his response Mr. CB stated,

> But through all of that, my first assessment of that would be I don't know what he did, but was there any treatments, or recommendations to him as far as attending alcohol classes like ASAP,[5] or anything like that while he was in the Air Force? Was there any of that stuff - you know - offered to him? Was it command driven, or whatever? . . .

The Defense offered and the military judge admitted Defense Exhibit C, a character letter from two of Appellant's cousins. The cousins opined that Appellant "bonded with the wrong people and became addicted by abusing alcohol," and that Appellant's "only way to recover and change his life, is to be around his/our family, where he is supported, happy and able to get rid of the alcohol addiction . . . ."

Appellant also provided a written unsworn statement to the military judge which included the following:

> I want to sincerely apologize for the offenses I have been convicted of. All of the decisions were made under the influence of alcohol. I have struggled with an alcohol problem ever since I got a DUI in December 2017. . . . Hanging with the wrong crowd in the dorms caused me to start drinking almost daily . . . . I didn't realize I had a serious problem and didn't seek the right treatment, and I continued to make bad decisions under the influence of alcohol. . . .

After the Defense rested its presentencing case, the Government recalled Senior Master Sergeant (SMSgt) LP, Appellant's first sergeant, as a rebuttal witness.[6] After SMSgt LP testified that he had been involved in "referrals to ADAPT" for Appellant, trial defense counsel objected that the Defense had not "open[ed] the door" to such testimony. Trial counsel responded by citing Mr. CB's testimony and the Defense's cross-examination of TSgt IW. In response, trial defense counsel argued that Mr. CB did not testify that rehabilitative measures such as ADAPT had not been attempted, and that the Defense's cross-examination of TSgt IW did not refer to ADAPT at all. The military judge ultimately permitted SMSgt LP to testify in rebuttal, citing primarily Mr. CB's testimony to the effect that, as the military judge put it, "there wasn't enough

---

[5] "ASAP" was evidently a reference to the "Army Substance Abuse Program." *See* Army Regulation 600–85, *The Army Substance Abuse Program* (28 Nov. 2016).

[6] SMSgt LP had previously testified as a government witness for findings with regard to the Article 92, UCMJ, specifications.

done for his son, and that's why he may have violated the orders and got into the trouble that he got into."

In response to questioning by the military judge, SMSgt LP testified that Appellant had been referred to ADAPT multiple times, the first time following a DUI incident in December 2017. SMSgt LP described that Airmen referred to ADAPT who were under investigation were provided the option of deferring their participation until the investigation concluded, which is what happened in Appellant's case following the DUI. After the DUI investigation closed, Appellant participated in an alcohol dependency evaluation by ADAPT. SMSgt LP testified that Appellant was referred to ADAPT again after the November 2018 assault and battery of RM in Cambridge, and Appellant again deferred participation in light of the ongoing investigation. The military judge did not permit trial counsel to ask SMSgt LP whether Appellant ever "outright declined" to participate in ADAPT, as opposed to choosing to attend or to defer participation.

After the military judge received SMSgt LP's testimony, he commented on his perspective on Appellant's decision to defer participation in ADAPT and on why he admitted SMSgt LP's testimony:

> I'm very familiar with the fact that when a client gets referred to ADAPT, that many times the client is told [by their defense counsel], "Don't say anything. Don't do anything at this point. There's reasons you shouldn't say anything or do anything." I mean, I think we all as lawyers understand that, and I have experience with it from long ago. So, got it. I mean, if your point is that he was referred to ADAPT, the unit did what they should have done and directed him to ADAPT based upon the incidents that occurred, that I have all the paperwork on, then I got it. [A]nd I'm going to overrule the objection because I think that's legitimate, that at least the unit was doing their job.

> Because that was a concern of mine when I asked [TSgt IW] was, was the unit just letting [Appellant] down and letting him just flail in the wind, even though he smelled like alcohol and looked disheveled. I didn't necessarily get that from [TSgt IW], that the answer that no, the unit didn't let him down. It sounds, from [SMSgt LP's] testimony that they didn't let him down. They put him in the program, and he had the opportunity to decline or to participate. There's many reasons why he would decline based upon what he was alleged to have done. So in my mind, I don't see any prejudice to [Appellant], because I completely understand why he might not participate based upon what he was facing.

**2. Law**

"We review a military judge's decision to admit evidence for an abuse of discretion." *United States v. Norwood*, 81 M.J. 12, 17 (C.A.A.F. 2021) (citation omitted). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003) (citing *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

The legal function of rebuttal evidence is to "explain, repel, counteract or disprove the evidence introduced by the opposing party." *United States v. Saferite*, 59 M.J. 270, 274 (C.A.A.F. 2004) (quoting *United States v. Banks*, 36 M.J. 150, 166 (C.M.A. 1992)) (additional citations omitted). "The scope of rebuttal is defined by evidence introduced by the other party." *Banks*, 36 M.J. at 166 (citations omitted). "Rebuttal evidence, like all other evidence, may be excluded pursuant to [Mil. R. Evid.] 403 if its probative value is substantially outweighed by the danger of unfair prejudice." *Saferite*, 59 M.J. at 274 (citing *United States v. Hursey*, 55 M.J. 34, 36 (C.A.A.F. 2001)). Military judges are afforded broad discretion in applying Mil. R. Evid. 403, but we give less deference to military judges "if they fail to articulate their balancing analysis on the record." *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009) (quoting *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citations and quotation marks omitted)).

Whether an error is harmless is a question of law we review de novo. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017). "When there is error in the admission of sentencing evidence, the test for prejudice 'is whether the error substantially influenced the adjudged sentence.'" *United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018) (quoting *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009)). We consider four factors when determining whether an error had a substantial influence on the sentence: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (citations omitted).

**3. Analysis**

Appellant contends the military judge abused his discretion by admitting SMSgt LP's rebuttal testimony regarding Appellant's command-directed referrals to the ADAPT program. He concedes that at trial the Defense attempted

to "establish as a matter in mitigation that during the charged timeframe . . . Appellant struggled with alcohol abuse." However, he asserts "[n]o witness mentioned military alcohol treatment programs in response to a defense question." Appellant further contends the military judge mistakenly believed the Defense, rather than the military judge himself, first brought up the subject of ADAPT.[7]

Reviewing under the deferential abuse of discretion standard, we do not find the military judge erred. Information elicited by the Defense, independent of information elicited by the military judge, suggested the Air Force had not done enough to assist Appellant with alcohol dependency as a matter in mitigation. For example, the assertion in Defense Exhibit C that the "only way [for Appellant] to recover and change his life, is to be around his/our family, where he is supported, happy and able to get rid of the alcohol addiction" implied Appellant had not received such support or opportunities from his chain of command. In that light, SMSgt LP's testimony that Appellant's command had referred him to ADAPT multiple times for evaluation was relevant to "counteract" the Defense's presentation. *See Saferite*, 59 M.J. at 274. Furthermore, although the military judge did not conduct an explicit balancing analysis under Mil. R. Evid. 403, he could reasonably conclude the danger of unfair prejudice in this judge-alone proceeding did not substantially outweigh the probative value. *See Sanders*, 67 M.J. at 346 (citations omitted) ("[A] military judge is presumed to know the law and apply it correctly, absent clear evidence to the contrary."). In this regard, the military judge noted he found it entirely understandable that Appellant would defer or decline participation in ADAPT in light of the ongoing investigation and proceedings. Accordingly, we find the military judge's ruling to permit limited rebuttal testimony that Appellant's command had referred him to ADAPT was neither arbitrary, fanciful, nor clearly unreasonable. *See McElhaney*, 54 M.J. at 130.

Assuming *arguendo* the military judge did err by admitting SMSgt LP's rebuttal testimony, we conclude such an error did not substantially influence Appellant's sentence. The Government's sentencing case was very strong. Appellant not only participated in the unprovoked violent assault on RM leading to Appellant's arrest by British police, but engaged in further misconduct by blatantly disobeying his commander's orders to have no contact with Amn NB and to be restricted to base while under investigation for that assault. Moreo-

---

[7] The military judge accepted trial defense counsel's proposition that the military judge's own questions would not open the door to rebuttal evidence, stating: "I know I asked about ADAPT, but that obviously wouldn't open the door in my mind. But I believe [D]efense - it was mentioned in the answer that [D]efense got [from TSgt IW], and that's why I actually asked about it."

ver, the Government introduced evidence of numerous other instances of misconduct from Appellant's service record, including three nonjudicial punishment actions and two vacation of suspended punishment actions under Article 15, UCMJ, 10 U.S.C. § 815, two letters of reprimand (including one for a DUI conviction in British court), and an administrative demotion. In addition, the military judge received RM's unsworn statement and testimony from RM's fiancée describing RM's medical, emotional, and financial problems following the assault. The Defense's sentencing case was not insubstantial—in particular, the testimony of Dr. KB, an Air Force neurologist, cast some doubt on the extent to which RM's problems were attributable to Appellant's actions. However, the Defense's case otherwise relied primarily on Appellant's unsworn statement and statements or testimony of family members, who attempted to portray Appellant as an individual with considerable talent and potential who was unfortunately bedeviled by alcohol abuse. On the whole, the Government's evidence in aggravation and the extensive negative information from Appellant's service record significantly outweighed the evidence in mitigation and extenuation.

As for the materiality and quality of the rebuttal evidence, SMSgt LP's testimony was not significantly harmful to the Defense. SMSgt LP essentially testified that Appellant's command had referred him to ADAPT after his DUI in late 2017 and after the November 2018 assault on RM, and that Appellant had initially deferred participation while the investigations were ongoing. The military judge made a point of stating he "completely underst[oo]d" why Appellant would defer participation under the circumstances, and that testimony would not prejudice Appellant. Moreover, we find no prospect that SMSgt LP's testimony regarding the simple fact of Appellant's referral to ADAPT substantially influenced the sentence. TSgt IW's testimony during the Government's presentencing case already implied Appellant had been so referred; SMSgt LP's testimony did not *directly* contradict any other statement or testimony; and this collateral information regarding the official response to Appellant's misconduct was of slight if any significance in comparison to the weight of other evidence bearing on aggravation, mitigation, and extenuation.

**C. Sentence Severity**

### 1. Additional Background

During presentencing proceedings, pursuant to Rule for Courts-Martial 1001(c), RM submitted a written unsworn statement which he also read to the military judge. Therein, RM described several financial, emotional, and medical problems he had experienced following the November 2018 assault. The medical problems he described included tinnitus, headaches, panic attacks, depression, anxiety, and loss of sleep and appetite, among others. In addition, RM related that he attempted suicide in February 2019, and in March 2019 he

suffered a "mild stroke" which he "believe[d] . . .was caused, at least in part," by injuries suffered in the assault. RM's fiancée, TC, testified as a government presentencing witness and provided similar information.

The military judge sentenced Appellant on 21 August 2019 to a bad-conduct discharge, confinement for a total of five months, and a reprimand. The convening authority approved the sentence.

Amn NB and Amn MO were also charged and tried by special courts-martial for their involvement in the assault and battery of RM.

Amn NB was tried by a military judge sitting alone. Amn NB pleaded guilty to one specification of absence without leave and one specification of false official statement, in violation of Articles 86 and 107, UCMJ, 10 U.S.C. §§ 886, 907; the military judge found him guilty, contrary to his pleas, of committing assault consummated by battery on RM by unlawfully striking him on the head and body with his hand and by kicking him on the head and body with his foot, in violation of Article 128, UCMJ.[8] *Bah*, unpub. op. at *1–2. The military judge sentenced Amn NB to a bad-conduct discharge, confinement for six months, reduction to the grade of E-1, and a reprimand. *Id*. at *2. This court affirmed the findings and sentence. *Id*. at *30.

This court has not reviewed Amn MO's court-martial. However, on appeal, Appellant moved to attach the summarized record of Amn MO's special court-martial, and we granted the motion over the Government's opposition. The record provided to the court indicates that, pursuant to a pretrial agreement, Amn MO elected to be tried by a military judge alone, and pleaded guilty to one specification of assault consummated by battery on RM by striking RM in the body and head with his hand in violation of Article 128, UCMJ.[9] The military judge—the same judge who presided at Appellant's trial, but not Amn NB's trial—found Amn MO guilty in accordance with his pleas and on 24 October 2019 sentenced him to confinement for 15 days, reduction to the grade of E-1, and a reprimand.

### 2. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find

---

[8] As described above, this court affirmed the guilty findings in part on the basis of the military judge's finding that Amn NB was liable as a principal for blows struck by others involved in the assault, particularly Amn MO. *Bah*, unpub. op. at *12, *18–21.

[9] Amn MO did not plead guilty to additional language in the specification alleging he also kicked RM in the head and body with his foot. The Government withdrew this excepted language after the military judge entered his findings.

correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10 U.S.C. § 866(d). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (quoting *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009)). Our sentence appropriateness review includes "considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). Although we have "broad discretionary power to review sentence appropriateness," *United States v. Kelly*, 77 M.J. 404, 405 (C.A.A.F. 2018), we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

Courts of Criminal Appeals (CCAs) are "not required . . . to engage in sentence comparison with specific [other] cases 'except in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'" *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (quoting *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)). Cases are "closely related" when, for example, they involve "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *Id.* "[A]n appellant bears the burden of demonstrating that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.' If the appellant meets that burden . . . then the Government must show that there is a rational basis for the disparity." *Id.*; *see also United States v. Durant*, 55 M.J. 258, 261–63 (C.A.A.F. 2001) (holding a highly disparate sentence in a closely related case did not warrant sentence relief where a rational basis for the difference existed).

### 3. Analysis

Appellant contends his sentence is highly disparate compared to that in the closely related case of Amn MO, and that there is no rational basis for the disparity.

As an initial matter, the Government contends we may not consider the summarized record of trial from Amn MO's court-martial because it is outside the "entire record of trial," as defined in *United States v. Jessie*, 79 M.J. 437, 440 (C.A.A.F. 2020). We disagree. In *Jessie*, the United States Court of Appeals for the Armed Forces (CAAF) explained that, as a general rule, a CCA reviewing a case referred to it "cannot consider matters outside the 'entire record,'" defined as the "record of trial," "allied papers," and "briefs and arguments that government and defense counsel (and the appellant personally) might present

regarding matters in the record of trial and 'allied papers.'" *Id*. at 440–41 (citations omitted). The outcome of Amn MO's court-martial does not appear in the entire record of Appellant's court-martial, as defined by *Jessie*. However, in *Jessie* the CAAF recognized, and declined to overrule, precedent creating an exception to this general rule where material from outside the record "is necessary for resolving issues raised by materials in the record." *Id*. at 444. As noted above, our superior court has long required CCAs to consider highly disparate sentences in closely related cases as an aspect of sentence appropriateness review under Article 66, UCMJ. *See, e.g.*, *United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001); *Lacy*, 50 M.J. at 288; *United States v. Brock*, 46 M.J. 11, 13 (C.A.A.F. 1997). The CAAF has not overturned this line of precedent in light of *Jessie*. Accordingly, we reconcile *Jessie* with this preexisting precedent by placing the results of closely related courts-martial within *Jessie*'s exception for matters necessary to resolve issues raised by matters contained in the record of trial where, as in this case, the role of the servicemember whose sentence is sought to be compared is apparent from the appellant's record. *Cf. Brock*, 46 M.J. at 12–13 (noting appellant moved the CCA to take notice of the promulgating order of the coactor's court-martial, and finding the CCA erred by refusing to consider it). Therefore, we have reviewed the summarized transcript of Amn MO's court-martial to determine if his case was in fact closely related to Appellant's, if the sentences are highly disparate, and if so whether there is a rational basis for the different results.

We find Amn MO's case is closely related to Appellant's. Cases are closely related when there is a "direct nexus" between the two servicemembers, such as "coactors involved in a common crime." *Lacy*, 50 M.J. at 288. In this case, Appellant and Amn MO were both part of the same group of Airmen who initiated the assault on RM, and both were convicted of committing assault consummated by a battery on RM at the same time and place. Accordingly, we find a direct nexus between the two servicemembers and their courts-martial. Although Appellant was also convicted of two later violations of Article 92, UCMJ, not involving Amn MO, the CAAF has not held that convictions must be identical in order for the cases to be closely related for purposes of sentence comparison. *See, e.g.*, *Brock*, 46 M.J. at 11–13 (finding CCA erred by failing to consider whether another Airman's case involving non-identical offenses were closely related to the appellant's).

The next step in our analysis is to determine whether the sentences are highly disparate. Appellant received, *inter alia*, confinement for five months and a bad-conduct discharge; Amn MO received confinement for only 15 days and no punitive discharge. These are significantly different outcomes. The Government argues the sentences are nevertheless not highly disparate, in part because Appellant was sentenced for three offenses and Amn MO sentenced for only one offense. We recognize that very dissimilar sentences adjudged in

closely related cases may not necessarily be highly disparate for purposes of sentence comparison, depending on various factors. *Cf. Durant*, 55 M.J. at 262 (assuming *without deciding* that appellant's sentence including a bad-conduct discharge and confinement for 12 months and the coactor's sentence including neither a punitive discharge nor confinement were highly disparate). However, we note the military judge sentenced Appellant to five months of confinement specifically for the assault and battery of RM, compared to the 15 days Amn MO received. We will assume that Appellant's sentence and Amn MO's sentence are highly disparate for purposes of our analysis under *Lacy*.

Therefore, the question becomes whether there is a rational basis for the disparity. *Lacy*, 50 M.J. at 288. We find that there is. We note the following, non-exclusive potential reasons contributing to the different sentences.

First, as noted, Appellant was convicted of three offenses, whereas Amn MO was convicted only of one. Moreover, in contrast to Amn MO, Appellant continued to engage in significant misconduct after he was arrested for the assault of RM and while he knew he was under investigation for that offense, leading to his pretrial confinement. Thus Appellant was sentenced for a greater amount of misconduct, and the military judge could reasonably have found the circumstances reflected unfavorably on Appellant's contrition and rehabilitative potential in comparison to Amn MO.

In addition, whereas Appellant pleaded not guilty to the charges against him, Amn MO pleaded guilty to assaulting and battering RM. Although it would be inappropriate for the military judge to increase Appellant's sentence for maintaining his right to require the Government to prove his guilt—and we find no indication the military judge did so—the military judge could reasonably consider Amn MO's guilty plea and acceptance of responsibility as a positive signal regarding his rehabilitative potential. *See United States v. Edwards*, 35 M.J. 351, 355 (C.M.A. 1992) ("[A] guilty plea is a positive first step to rehabilitation and may be considered as a mitigating factor at sentencing.").

Furthermore, Appellant was the only participant in the assault on RM noted to have used a weapon, albeit an improvised one, specifically a belt with a buckle. In addition, the CCTV video depicted Appellant and Amn NB approaching RM from behind on either side at the same time. Although Amn NB apparently struck first, Appellant swung at RM with the belt immediately thereafter. In contrast, according to Amn MO's statements at his court-martial, and supported by the CCTV video, Amn MO swung at RM only at a later point in the incident. The military judge could have reasonably found these details indicated a greater degree of premeditation and responsibility regarding the incident on Appellant's part as compared to Amn MO.

Additionally, Appellant's sentencing case was arguably weaker than Amn MO's. The two were similar in some respects. Whereas Appellant's parents testified on his behalf, Amn MO's spouse and brother-in-law (a United States Army veteran and civilian police officer) testified on his behalf. The Government introduced evidence of additional misconduct from each Airman's personnel records, but Appellant's history of misconduct was significantly more extensive. In addition, whereas TSgt IW specifically testified to the "extremely poor" quality of Appellant's duty performance, there was no equivalent negative testimony from Amn MO's command or supervisors. Appellant offered a two-page written unsworn statement; Amn MO provided an oral as well as written unsworn statement that were arguably more effective. RM provided similar unsworn victim impact statements in each case. Both Appellant and Amn MO called the same Air Force neurologist, Maj KB, who provided similar testimony in each case. Maj KB essentially testified that she doubted a stroke RM suffered months after the assault was caused by the incident, and she opined that the tinnitus and headaches RM described experiencing after the assault could have other causes, such as preexisting drug prescriptions RM was taking. However, Amn MO additionally called a civilian psychiatrist, Dr. PO, who had reviewed some of RM's medical records and interviewed RM. In combination, the testimony of Maj KB and Dr. PO in Amn MO's court-martial went much further in detailing RM's significant preexisting and subsequent physical and mental health issues, in effect going substantially further to cast doubt on the negative victim impact attributable to the assault itself. While we cannot know the military judge's exact reasoning, the relative strength of Amn MO's sentencing case compared to Appellant's provides an additional rational basis for additional differences in their adjudged punishments.

Finally, we note that Appellant's sentence was similar and not highly disparate compared to Amn NB's sentence; in fact, Appellant received slightly less punishment than Amn NB. In that sense, Amn MO's sentence rather than Appellant's was the outlier of the three. Although we are required to compare highly disparate sentences in closely related cases as part of our sentence appropriateness review, we are not required to reduce an otherwise appropriate sentence where one Airman happened to receive a lower sentence than multiple others who were involved. *See Durant*, 55 M.J. at 261 ("[T]he military system must be prepared to accept some disparity in the sentencing of codefendants, provided each military accused is sentenced as an individual.") (citations omitted). More to the point, applying *Lacy* in light of the considerations above, we find a rational basis for the military judge to have imposed the differing sentences in Appellant's court-martial and Amn MO's court-martial.

Accordingly, having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, all other matters contained in the record of trial, and the sentences adjudged in closely

related courts-martial, we conclude Appellant's sentence is not inappropriately severe.

## D. Admission of the CCTV Video

### 1. Additional Background

Before Appellant entered his pleas, the Government sought to preadmit Prosecution Exhibit 1, the CCTV video of the assault on RM in Cambridge on 25 November 2018. To that end, the Government called SrA DG, one of the Airmen who was with Appellant that night and was present at the incident. Trial counsel asked SrA DG a series of questions summarizing his recollection of events of that night leading up to the point that the "physical altercation" with RM occurred.

Trial counsel then played the video from Prosecution Exhibit 1 for SrA DG to view. In response to further questioning, SrA DG agreed that he recognized what the video depicted, specifically a "fight" outside the club. In particular, SrA DG testified he recognized himself, Appellant, and Amn NB in the video. SrA DG further agreed the video was "a fair and accurate representation of the way that that altercation took place."

On cross-examination, trial defense counsel elicited that there were a number of aspects of the incident that SrA DG did not remember. These details included who struck or received the first blow; how many individuals were involved; whether SrA DG pushed anyone, was himself pushed, or if he fell on the ground; and SrA DG's inability to identify RM on the video or in person. When trial defense counsel asked whether SrA DG was "basing [his] testimony here today on that video," he responded, "[s]ome from memory, some from the video," and later elaborated, "from the video and a little bit from memory." On redirect examination, SrA DG agreed that he "remember[ed] some portions of the altercation, and some portions were not as clear." He further agreed that "every single part of what [he] did remember," Prosecution Exhibit 1 showed "accurately." The Government did not call additional witnesses to preadmit Prosecution Exhibit 1.

The Defense objected to the admission of Prosecution Exhibit 1 on the basis of "foundation and authentication." After receiving argument, the military judge issued an oral ruling admitting Prosecution Exhibit 1. He explained:

> I do find that there is a foundation and authentication. For the authentication piece, it goes to the weight and not the admissibility, because we don't have - as far as I know, there's nobody going to be called in to talk about the video, to how it was recorded, where it's kept, and all that stuff. But I'm still admitting it based upon [SrA DG's] testimony, that it would in fact help his

> testimony, and that it was, from his memory, an accurate record-
> ing of what happened that night outside of [the club].

The military judge later supplemented his oral ruling with a written ruling. He wrote, in part:

> [T]he recording is helpful in demonstrating how the attack oc-
> curred and it assists witnesses in testifying by allowing them to
> point out where they were as the attack on RM transpired. The
> court is comfortable with the foundation and authentication of
> the recording because of the number of witnesses who can iden-
> tify the scene and describe what transpired in the recording
> without needing the recording to do so. The recording does aid
> those witnesses['] testimony and sometimes refreshes their rec-
> ollections, but it is not the primary source of their memory, what
> happened on the street that evening, or what their part in the
> event was.

The military judge further explained the probative value of the video was "high" and not substantially outweighed by the danger of unfair prejudice or any other countervailing consideration. *See* Mil. R. Evid. 403; *United States v. Berry*, 61 M.J. 91, 95 (C.A.A.F. 2005).

**2. Law**

We review a military judge's decision to admit evidence for an abuse of dis-cretion. *Norwood*, 81 M.J. at 17 (citation omitted). "A military judge abuses his discretion when his findings of fact are clearly erroneous, [his] decision is in-fluenced by an erroneous view of the law, or [his] decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008) (citations omitted). "The abuse of discretion standard is a strict one . . . ." *McElhaney*, 54 M.J. at 130.

"To satisfy the requirement of authenticating or identifying an item of evi-dence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule for Courts-Martial 901(a). "Evidence may be authenticated through the testimony of a witness with knowledge 'that a matter is what it is claimed to be.'" *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013) (quoting Mil. R. Evid. 901(b)(1)).

> Generally speaking, the proponent of a proffered item of evi-
> dence needs only to make a prima facie showing that the item is
> what the proponent claims it to be. . . .

> Once the proponent has made the requisite showing, the trial court should admit the item, assuming it meets the other prerequisites to admissibility . . . in spite of any issues the opponent has raised about flaws in the authentication. Such flaws go to the weight of the evidence instead of its admissibility.

*Id*. at 174 (quoting 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 901.02[3], at 901-13 to 901-14 (Joseph M. McLaughlin ed., 2d ed. 2003)).

### 3. Analysis

Appellant contends the military judge abused his discretion by admitting Prosecution Exhibit 1. He asserts the military judge relied upon clearly erroneous factfinding in two respects. First, Appellant cites the written ruling's reference to multiple witnesses who could "identify the scene and describe what transpired," when the military judge had only received evidence from SrA DG at the point he admitted Prosecution Exhibit 1. Second, Appellant contends the finding that the video was "not the primary source" of SrA DG's memory conflicts with SrA DG's statement that his testimony was "a little bit from memory." In addition, Appellant also contends the military judge's references to the potential for Prosecution Exhibit 1 to aid witnesses' testimony or refresh their recollection indicate he erroneously confused such non-substantive uses with the authentication requirements for substantive evidence.

We find the military judge did not abuse his discretion when he preadmitted Prosecution Exhibit 1. SrA DG's testimony met the relatively low standard of a prima facie showing that the exhibit was what the Government purported it to be—an accurate videorecording of the altercation wherein RM was assaulted. SrA DG testified that Prosecution Exhibit 1 was a "fair and accurate representation" of exactly that. He could identify himself, Appellant, and Amn NB in the video. Although there were aspects of the incident SrA DG could not remember, or perhaps did not observe at the time, the video "accurately" depicted "every single part" of what he did remember. Accordingly, the military judge could reasonably find any gaps in the authentication applied to the exhibit's weight rather than its admissibility.

We acknowledge the references to other witnesses in the written ruling do little to clarify the military judge's rationale. Appellant is correct that, at the point the military judge admitted Prosecution Exhibit 1, only SrA DG had testified about it. Perhaps these references may be understood as explaining the anticipated relevance and materiality of the video in light of the Government's proffers as to expected witnesses; or perhaps it was simply an error in a written

ruling drafted at a later point in the court-martial. Regardless, any inartfulness or ambiguity in the written ruling in this regard does not defeat the sufficiency of SrA DG's testimony authenticating the exhibit.

In a similar vein, Appellant's arguments regarding the military judge's apparent legal rationale make a valid point but are ultimately unavailing. We agree with Appellant that potential use of the CCTV video as a demonstrative aid for witness testimony or to refresh recollection would not be a basis to admit Prosecution Exhibit 1 as substantive evidence. It is not clear why the military judge elected to include such uses in his ruling. However, it is additionally clear the military judge found Prosecution Exhibit 1 highly relevant evidence in its own right, noting it depicted Appellant's "presence at the scene of the attack on RM and how the attack occurred." Stripping away any rationales regarding use as demonstrative evidence or to refresh recollection, SrA DG's testimony and the military judge's oral and written rulings indicate the admission of Prosecution Exhibit 1 was neither arbitrary, fanciful, nor clearly unreasonable. *See McElhaney*, 54 M.J. at 130.

Accordingly, although another trial judge might reasonably have required more authentication from the Government, we conclude the admission of Prosecution Exhibit 1 on the basis of SrA DG's testimony was within "the range of choices reasonably arising from the applicable facts and the law," and not an abuse of discretion. *Miller*, 66 M.J. at 307.

### III. CONCLUSION

We affirm the finding of guilty as to the Specification of Charge I, excepting the words "and head" and "with his hand;" the excepted words are set aside. The findings of guilty as to Charge I, Charge II, and the specifications of Charge II, and the sentence, as reassessed, are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59 and 66(d), UCMJ, 10 U.S.C. §§ 859, 866(d). Accordingly, the findings, as modified, and sentence, as reassessed, are **AFFIRMED**.

FOR THE COURT

ANTHONY F. ROCK, Maj, USAF
Acting Clerk of the Court

25